**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **VICTOR VELEZ,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | **No. 12 C 07518** |
| **v.** | ) | |
| | ) | |
| **MICHAEL P. ATCHISON, Warden,** | ) | **Judge John J. Tharp, Jr.** |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Petitioner Victor Velez's petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. For the following reasons, the Court denies Velez's petition and declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

**I.      Background**

**A.  Facts**[1]

On December 29, 2003, Velez accompanied a fellow gang member, Jesus Vega, to a bar in order to retrieve money from Jose Soto, another fellow gang member. Sometime en route, Vega told Velez that he intended to shoot Soto if he did not have the money, and Vega showed Velez that he was carrying a handgun. Subsequently, Vega gave Velez a cell phone and told him to act as a lookout and to alert him if the police arrived.

---

[1] The facts in this opinion are principally derived from the state appellate court's opinion affirming Velez's conviction. *See People v. Velez*, 388 Ill. App. 3d 493, 903 N.E.2d 43 (1st Dist. 2009). The state court's factual findings are presumed to be true, and Velez has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C.§ 2254(e)(1); *Thompkins v. Pfister,* 698 F.3d 976, 983 (7th Cir. 2012). The presumption of correctness also applies to factual findings made by a state court of review based on the trial record. *Morgan v. Hardy,* 662 F.3d 790, 797-98 (7th Cir. 2011) ("The presumption of correctness also applies to factual findings made by a state court of review based on the trial record.").

At trial, Soto's wife testified about the events of that night. She stated that she drove to the bar to give Soto something, but then she left to retrieve money from an ATM. She returned to the bar and waited in her car while Soto came out to pick up the money. After Soto got the money, he began to walk back to the bar. Soto's wife then saw Vega approach Soto and shoot him from approximately four feet away. Soto tried to run for safety, but Vega followed him and fired his gun at Soto four or five more times. Soto's wife, fearing that Vega would turn his gun on her, drove away from the scene. She eventually found Soto and attempted to take him to the hospital, but on the way they were involved in a car accident. The police and an ambulance thereafter transported Soto to the hospital where he later died from his gunshot wounds.

The next day, the police questioned Vega's distant cousin about the shooting. She lived approximately one block from the bar where the shooting took place, and she told the police, and later testified at trial, that on the night of the shooting Velez and Vega came to her home to request a dark, hooded sweatshirt. About fifteen minutes after they left with the sweatshirt, she heard gunshots. She also told the police that Velez called her shortly after she had heard the gunshots, and she was able to accurately identify Velez from a photograph. At that point, the police considered Velez to be a person of interest in the shooting.

Several days later, on January 9, 2004, Velez was brought into the police station, and police detectives John Day and Thomas Kolman began to question him. According to Day's testimony, Velez was not under arrest at that time; he was not wearing handcuffs, had not been photographed, and had not been fingerprinted when detectives entered the unlocked interview room to see him. Velez nonetheless claims that he was placed under arrest prior to coming to the police station, and that he remained under arrest the entire time he was there. The Illinois Appellate Court found that "[t]he record demonstrates, albeit scantily, that defendant voluntarily

went to the police station, at least initially." *People v. Velez*, 388 Ill. App. 3d 493, 505, 903 N.E.2d 43, 54 (1st Dist. 2009). Though Velez disagrees with this finding, he has not shown by clear and convincing evidence that it is incorrect. *See infra at* 20-21.

Before questioning Velez, Detective Day read Velez his *Miranda* rights. Velez immediately waived his rights and agreed to talk to the detectives; this interview lasted between sixty and ninety minutes. During the interview, Velez implicated himself in the crime by admitting that he acted as a lookout while Vega shot and killed Soto. After the interview, Detective Day asked Velez to take a polygraph examination. Velez agreed to both the polygraph and to stay overnight at the police station because the polygraph examiner was not available until the next morning. In the interim, Assistant State's Attorney James Papa arrived, and after again being advised of his *Miranda* rights, Velez agreed to speak with Papa in the presence of Detective Day. ASA Papa interviewed Velez for approximately thirty minutes. During the interview, Papa again asked Velez whether he would be willing to submit to a polygraph examination, and Velez again agreed. At the conclusion of Papa's interview, the police provided Velez with a cot, a beverage, and a bag of potato chips.

Sometime the next day, Velez was placed under arrest. He retained an attorney who came to the police station and met with him. After speaking with his lawyer, Velez declined to speak further with the police. But later, after his attorney had left the police station, Velez knocked on the door of his locked interview room and beckoned to Detective Kolman. Kolman opened the door and asked Velez what he needed. Velez responded that he wished to speak with him. Detective Kolman asked whether Velez had retained an attorney, and, if so, whether the attorney had told him not to speak to the police. Velez answered affirmatively to both questions, and Detective Kolman then asked if Velez still wanted to speak him despite his counsel's

instructions. Velez assented. Thereafter, Detective Kolman again advised Velez of his *Miranda* rights, which Velez again waived. During the ensuing fifteen minute conversation, Velez asked to speak once more to an Assistant State's Attorney, and ASA Jeanne Bischoff came and spoke with Velez. After Bischoff took Velez's oral statement, Velez agreed to allow Bischoff to write out his statement. ASA Bischoff took down Velez's statement by hand with Velez's assistance, and she then reviewed the statement with Velez by reading it out loud to him. After Bischoff made several changes to the statement at Velez's request, both Bischoff and Velez signed each page of the statement. ASA Bischoff admitted that Velez's attorney was not present when he gave his statement, even though she was aware that he had hired an attorney. She also admitted that Velez's statement was not a verbatim recitation of her conversation with him.

In his statement, Velez admitted that on December 29, 2003, he went with Vega to his cousin's house to obtain a sweatshirt. Velez stated that he asked Vega why they were in a "hot" neighborhood, and Vega revealed his handgun and told him that he intended to retrieve money from Soto, and that he intended to shoot Soto if he would not pay him. Vega then gave Velez a cell phone and instructed him to watch his back and call out if he saw the police. Velez also admitted in his statement that he stood across the street from the bar while Vega waited outside. Then, when Soto appeared, Vega fired five or six shots at him. Thereafter, according to Velez's statement, both Soto and Vega fled. Velez ran to another street nearby and waited for an additional thirty to forty minutes. Velez then used the cell phone to call Vega's cousin to ascertain Vega's location. Vega then called Velez and instructed him to meet at a designated address. When they met, Vega informed Velez that he had shot Soto. Velez returned the cell phone to Vega and the two parted ways.

**B. Procedural History**

A Cook County grand jury later indicted Velez for first degree murder. Prior to trial, Velez's defense counsel filed a Motion to Suppress Statements Made During Improper Interrogation, claiming that the police violated Velez's Fourth and Fifth Amendment rights during the interrogation. After Detectives Day and Kolman testified about Velez and ASA Bischoff's conversation leading to Velez's inculpatory statement, Velez's counsel advised the court that he wished to withdraw the motion. The judge then directly advised Velez that if he withdrew the motion, he could not litigate it again. Velez replied that he understood the consequences, and that he voluntarily and willingly wished to withdraw the motion.

At trial, the jury found Velez guilty of first degree murder and he was sentenced to forty-five years of imprisonment.

Velez appealed his conviction and sentence to the Illinois Appellate Court arguing that: 1) his trial counsel was ineffective for abandoning his motion to suppress his statement and for failing to file a motion to quash his arrest; 2) he was denied the right to a fair trial when the State impermissibly introduced testimony regarding his refusal to speak to police after invoking his right to counsel; 3) the trial court erred in allowing admission of gang-related evidence; 4) the cumulative errors deprived him of his right to a fair trial; 5) the evidence was insufficient to prove him guilty beyond a reasonable doubt on a theory of accountability; and 6) his sentence of forty-five years' incarceration was excessive. The Illinois Appellate Court affirmed Velez's conviction and sentence. *See People v. Velez*, 388 Ill. App. 3d 493, 903 N.E.2d 43 (1st Dist. 2009).

Velez then filed a petition for leave to appeal to the Illinois Supreme Court, where he raised the following claims: 1) the State impermissibly commented on his post-arrest silence; 2)

the appellate court erred by denying his ineffective assistance of counsel claim; and 3) the appellate court erred in reaching the merits of his suppression motion. The Illinois Supreme Court denied Velez's petition for leave to appeal without an opinion. *People v. Velez*, 232 Ill.2d 594, 910 N.E.2d 1131 (Ill. 2009). Velez petitioned to the United States Supreme Court for a writ of certiorari, but his petition was denied. *Velez v. Illinois*, 558 U.S. 948 (2009).

Velez then initiated a claim for post-conviction relief in state court pursuant to 725 ILCS 5/122-1, raising four claims: 1) his trial counsel was ineffective for failing to file a motion to quash his arrest and suppress evidence; 2) his trial counsel was ineffective for failing to object to the introduction of his written statement on the grounds that it was inadmissible under the "completeness" doctrine; 3) there was insufficient evidence to prove him guilty under a theory of accountability; and 4) his prison sentence was excessive because it was greater than the sentence given to Vega, the actual shooter. The state trial court summarily dismissed Velez's post-conviction petition, and the appellate court affirmed the dismissal. *People v. Velez*, No. 1-10-1650, 2011 IL App (1st) 101650-U (1st Dist. Dec. 7, 2011). Velez then petitioned the Illinois Appellate Court for rehearing, but his petition was denied. He petitioned the Illinois Supreme Court for leave to appeal, but the court denied that petition as well. *People v. Velez*, No. 114052, 968 N.E.2d 1072 (Ill. May 30, 2012).

Velez now brings a petition for writ of habeas corpus,[2] raising the following claims: (1) in violation of due process, the evidence at trial did not prove him guilty beyond a reasonable

---

[2] The petition appears to be timely and the respondent does not argue otherwise. The one-year statute of limitations for filing the petition, 28 U.S.C. § 2244(d)(1), began to run upon denial of Velez's certiorari petition on October 13, 2009. *Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009) (direct review does not conclude until availability of review to Supreme Court has been exhausted). It was tolled upon the filing, and during the pendency, of his state court petition for post-conviction relief, which period ended with denial of his petition for leave to appeal to the Illinois Supreme Court on May 30, 2012. 28 U.S.C. § 2244(d)(2); *Lawrence v. Florida*, 549 U.S.

doubt; (2) the State improperly commented on his post-arrest silence; (3) the police violated his Fifth Amendment right to counsel and to remain silent; (4) his trial counsel was ineffective because he failed to file a Motion to Quash Arrest and Suppress Evidence or object to the admission of Velez's written statement; (5) his appellate counsel was ineffective for failing to raise his trial counsel's ineffectiveness; and (6) his sentence is disproportionate and excessive.

## II.    Analysis

To be eligible for a writ of habeas corpus, Velez must demonstrate that he "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see Cheeks v. Gaetz*, 571 F.3d 680, 684 (7th Cir. 2009). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal court adjudicating a habeas petition may grant relief on the basis of a claim that has been adjudicated on the merits by a state court only if the state court proceeding "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in the light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d).[3] A judgment is "contrary to" established federal law when the court applies a rule that contradicts Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). "An

---

327, 331-32 (2007) (post-conviction tolling period does not include time for filing certiorari petition in U.S. Supreme Court); *see also Taylor v. Michael,* ---F.3d---, 2013 WL 3885980, *2 (July 30, 2013) (noting difference between end of direct review period and end of post-conviction review period). Putting aside more intricate questions about the measurement of time on the habeas clock that would not be material to the calculation in this case, at most about 299 days had run off of the 365 day clock wen the petition was filed on September 19, 2012.

[3] Claims that were not adjudicated on the merits in state court proceedings, by contrast, are subject to evaluation under the general standard set forth in 28 U.S.C. § 2243, which requires federal courts to "dispose of the matter as law and justice require." *See Cheeks*, 571 F.3d at 684-85.

'unreasonable application' occurs when a state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] petitioner's case." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotation omitted). "[I]f it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application." *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002). This deferential standard of review comes with the burden "on the petitioner to show that the state court's determination of fact or its application of federal law was unreasonable." *Sturgeon v. Chandler*, 552 F.3d 604, 609 (7th Cir. 2009).

## A. Velez's Claims Are Not Procedurally Defaulted.

Habeas petitioners are required to exhaust their state court remedies before seeking relief in federal court. 28 U.S.C. § 2254(b)(1)(A). To exhaust his claims, a habeas petitioner must present each claim in "one complete round of the State's established appellate review process." *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). In Illinois, that means that a "petitioner must have presented each claim in the habeas petition to the Illinois Appellate Court and to the Illinois Supreme Court in a petition for discretionary review." *Smith v. McKee*, 598 F.3d 374, 382 (7th Cir. 2010); *see also O'Sullivan*, 526 U.S. at 845 (to exhaust his state court remedies, a petitioner must present "a petition for discretionary review in Illinois' Supreme Court"). To properly exhaust his claims, Velez should have "fairly presented both the operative facts and legal principles that control each claim to the state judiciary." *Smith*, 598 F.3d at 382. Velez asserts in his petition that he presented all grounds raised in the petition to the highest court having jurisdiction, Pet. at 6, but the record suggests that he did not do so for several of his claims—specifically, at least, his claims that (1) the evidence at trial could not have proven him guilty beyond a reasonable doubt, (2) his appellate counsel was ineffective, and (3) his sentence

was disproportionate and excessive. Velez did not present any of these three claims in his petition for leave to appeal to the Illinois Supreme Court. Dkt. 10-6 at 3-23.

Velez's failure to present these claims to the state courts, however, does not mean that the claims are not now exhausted; the exhaustion requirement "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *see also Coleman v. Thompson,* 501 U.S. 722, 732 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."). Here, the state concedes that Velez has exhausted his state court remedies as to all of his claims because "no further litigation on them would be permitted in state court." Resp. (Dkt. 9) at 4.

Failure to properly exhaust available state court remedies, however, is a species of procedural default—the failure of a petitioner to follow a rule of state procedure at trial, on appeal, or on state post-conviction review. *Perruquet v. Briley*, 390 F.3d 505, 515 (7th Cir. 2004) ("[W]here, as in this case, the petitioner has already pursued his state-court remedies and there is no longer any state corrective process available to him, it is not the exhaustion doctrine that stands in the path to habeas relief, but rather the separate but related doctrine of procedural default."). The procedural default doctrine generally precludes a federal court from reaching the merits of a habeas claim when that claim was presented to the state courts and the state-court ruling against the petitioner rests on adequate and independent state-law grounds or, as here, "if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman,* 501 U.S. at 735 n.1; *see also Perruquet,* 390 F.3d at 514.

But here again, the state does not argue that Velez has procedurally defaulted any of his claims. Procedural default is not "an absolute bar to habeas relief in federal court;" rather, it "is an affirmative defense." *Cheeks*, 571 F.3d at 685. "[I]n the ordinary course of events, [the State's] failure to raise the defense in a timely manner will result in a forfeiture." *Id.* Section 2254(b)(3), however, requires an express waiver of the exhaustion defense and there is currently a circuit split regarding whether the express exhaustion waiver requirement applies to procedural defaults based on failure to exhaust state remedies. *See generally Eichwedel v. Chandler*, 696 F.3d 660, 670-71 (7th Cir. 2012); *Cheeks*, 571 F.3d at 686 n.1; *Perruquet,* 390 F.3d 515-16. The question remains open in this Circuit; in all three cases noting the split, the panels found it unnecessary to take a definitive position, and it is not necessary to do so here, either, because in conceding exhaustion expressly, the state is also deemed to have expressly waived any procedural default argument based on the petitioner's failure to exhaust claims. *See Eichwedel,* 696 F.3d at 670-71 (by conceding exhaustion, the state "has expressly waived any independent exhaustion argument, as well as any exhaustion argument included within the doctrine of procedural default"). Accordingly, the Court moves on to the merits of Velez's claims.

### B. The State Court Reasonably Concluded that the Evidence Was Sufficient to Convict Velez Beyond a Reasonable Doubt.

Velez first claims that the facts adduced at his trial were not sufficient to prove him guilty beyond a reasonable doubt, and therefore his conviction violated his right to due process. Velez argues that there was no evidence on which to base his conviction because two prosecution witnesses—Soto's wife and Angel Navarro, Soto's cousin who was also at the bar and who heard the gun shots—testified that they did not see him at the scene of the shooting. Their failure to place him at the scene of the shooting, Velez contends, contradicted the prosecution's key piece

of evidence against him—namely, his statement admitting that he acted as a lookout at the crime scene. Petition (Dkt. 1) at 5(a).

Petitioners raising insufficient evidence claims face a very heavy burden in federal habeas proceedings "because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (*per curiam*).

> First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. And second, on habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable.

*Id.* (internal citations omitted). Velez fails to carry that burden here.

In this case, the jury's conclusion was reasonable. Velez's actual presence at the crime scene is not necessarily inconsistent with the witnesses' testimony that they did not see him there. Obviously, Velez could have been at the scene even though two witnesses did not see him. Velez indicated in his statement that he stood lookout across the street from the bar, and fled when the shots were fired, so it is hardly surprising that neither witness saw him. Soto, understandably, focused on the shooting itself and locating her husband after the shooting, not on the identity of any other individuals who might have been somewhere outside the bar. Navarro was not even outside the bar at the time of the shooting, and he too focused on his cousin's plight when he emerged from the bar after hearing the shots fired. Given his own admissions and the corroborating evidence introduced (for example, the testimony of Vega's cousin, who placed Velez with Vega both before and after the shooting), a reasonable jury could have convicted him despite the testimony of two people who didn't see him there. Therefore, Velez's argument fails under the first layer of judicial deference. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979)

("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (emphasis in original). And failing to clear the first deference hurdle, Velez necessarily fails to clear the second: if it was not unreasonable for the jury to find beyond a reasonable doubt that he had been at the crime scene, then the state court's decision to reject Velez's insufficiency of the evidence claim could not have been objectively unreasonable either.

Velez also argues that the state court should not have considered his handwritten statement because the it was written by ASA Bischoff and was not a verbatim recitation of what he said. He claims that Bischoff wrote the statement so that it was biased towards his conviction, and it was therefore unconstitutionally introduced and admitted into evidence. Petition (Dkt. 1) at 5(a). Without the statement, Velez contends, the evidence at trial was not enough to convict him beyond a reasonable doubt. *Id.*

But even though Velez did not physically write the statement, he signed it and adopted it as his own. *See United States v. McCulley*, 178 F.3d 872, 876 (7th Cir. 1999) (defendant adopted statement written by inspectors by signing it). Because Velez adopted the statement, the fact that it was not a verbatim recitation of his words is inconsequential. Velez does not allege that any material information was omitted from the statement, nor does he argue that the statement is incorrect in any way. The written statement was admissible as a party admission and Velez has identified no basis on which the statement should have been excluded from the state's evidence against him.

The Court therefore concludes that the state court's decision rejecting his sufficiency of the evidence claim was not contrary to, nor an unreasonable application of, established federal law.

### C. The State Court Reasonably Concluded that the Prosecution Did Not Improperly Comment on Velez's Post-Arrest Silence.

Velez asserts that the state impermissibly introduced testimony regarding his refusal to speak to the police after invoking his right to counsel, in violation of his Fifth Amendment right against self-incrimination. The Due Process Clause prohibits introducing a defendant's post-arrest silence as substantive evidence of his guilt, *United States v. Robinson*, 485 U.S. 25, 34 (1988), or to impeach. *Doyle v. Ohio*, 426 U.S. 610, 619 (1976). "To determine whether a prosecutor's remarks are improper, [the court] look[s] to whether, when viewing the remarks in context: (1) it was the prosecutor's 'manifest intention' to use the defendant's exercise of his right as evidence of guilt; or (2) 'the remark was of such a character that the jury would 'naturally and necessarily' treat it as such.'" *United States v. Ochoa-Zarate*, 540 F.3d 613, 618 (7th Cir. 2008) (quoting *United States v. Willis*, 523 F.3d 761, 773 (7th Cir. 2008)). "[W]hether the government had the 'manifest intention' to treat the defendant's silence as evidence of guilt depends on the context of the statement, not the government's use of certain proscribed terms." *Willis*, 523 F.3d at 773.

The Court first addresses whether there was a *Doyle* violation when the statement was published to the jury. The statement regarding Velez's invocation of his right to counsel was included within Velez's written statement which was read to the jury. The statement is as follows:

> *Victor [Velez] met with an attorney, Ezra Hemphill, on January 10th, 2004. He met with the attorney in the afternoon and then told the detectives that he wanted an attorney.* Later on January 10th Victor [Velez] knocked on the door of his

> interview room and told the detectives that he wanted to talk to them without an attorney. Victor [Velez] told Detective Day and Detective Coleman that he wanted to make a statement without his lawyer. After he told the detectives he wanted to talk without a lawyer, Detective Coleman read him his Miranda rights again. Victor [Velez] then made a statement to the detectives. On January 10th at 9:45 p.m. Victor [Velez] met with ASA Bischoff who asked him whether he initiated the conversation with the detectives. Victor [Velez] told ASA Bischoff that he knocked on the interview room door and told the detectives he wanted to make a statement.

Dkt. 10-16 at CC-130 (emphasis added). Oddly, the state took the position at trial that the references to Velez's requests for counsel should be redacted from the statement because it would violate *Doyle* to include them, but defense counsel argued that including the statements would not violate *Doyle* and objected to the redaction. See AA 157-61 (Dkt. 10-12). The Court agreed with defense counsel and the written statement was not redacted. It is evident, then, that the prosecutor's manifest intent was not to argue that Velez's silence was substantive evidence of his guilt; the prosecutor initially sought to *avoid* any reference to Velez's invocation of his rights.

In any event, it is also clear that the trial court was right; including the references to Velez's requests for counsel did not constitute an improper comment on his invocation of his right to remain silent. In the context of the written statement, it is clear that the purpose of the references to Velez's requests for counsel was to provide a narrative to the jury explaining that the prosecution had advised Velez of his *Miranda* rights prior to taking his inculpatory statement. The prosecutor appears to have sought to demonstrate that Velez reinitiated communication voluntarily, which is permissible. *See Splunge v. Parke*, 160 F.3d 369, 372 (7th Cir. 1998) (affirming denial of habeas petition where prosecution introduced evidence that defendant first invoked right to remain silent, but later agreed to testify and was re-Mirandized).

More fundamentally, where a defendant "voluntarily speaks after receiving *Miranda* warnings," as Velez did, he "has not been induced to remain silent," and *Doyle* does not apply.

*Anderson v. Charles*, 447 U.S. 404, 408 (1980). "As to the subject matter of his statements, the defendant has not remained silent at all." *Id.* The state did not in any way argue or imply that Velez's silence and request for counsel was evidence of guilt; rather, the prosecutor argued that Velez's lack of silence—his inculpatory statements to the police after being informed of his rights—proved that he was guilty. "A description of the events following [Velez's] arrest was just the prologue to the introduction of [Velez's] actual statement—*that statement* was used against him, to be sure, but without any problem under the fourteenth amendment." *Splunge*, 160 F.3d at 373 (emphasis in original). By reading Velez's statement to the jury, the prosecution clearly was not asking the jury to infer guilt from Velez's *silence*, and therefore Velez's argument is rejected.

For much the same reason, even if there had been a *Doyle* violation in this case, the harmless-error doctrine would thwart Velez's claim. *Chapman v. California*, 386 U.S. 18, 23-25 (1967) (a *Doyle* violation is subject to harmless-error analysis). A *Doyle* violation is not harmless if it has a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The proper inquiry is to ask whether the error had an actual impact on the verdict. *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993). The inquiry is "not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Id.* (emphasis in original). *See also Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003) (The Court has stated that "a constitutional error is harmless when 'it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" ) (quoting *Neder v. United States*, 527 U.S. 1, 15 (1999)).

Here, any *Doyle* error would unquestionably have been harmless because Velez did not remain silent; he confessed. There is no reasonable prospect that the jury based its verdict on his short-term silence, which was uncommented upon by the prosecution, when Velez ultimately confessed to the crime, his signed confession was entered into evidence, and the prosecution focused on the inculpatory statements set forth in that confession during its arguments. Therefore, even if the State's cursory reference to Velez's request for counsel was improper, the error was harmless.

For these reasons, the state court's decision was not contrary to, and did not involve an unreasonable application of, federal law. Velez's petition for writ of habeas corpus on this ground is denied.

### D.  The Police Did Not Violate Velez's Fifth Amendment Right to Counsel.

Velez next claims that police violated his rights by responding to his knock on the door with questions designed to draw him into a conversation. Reply Br. (Dkt. 15) at 12. Once a suspect has told the police that he wishes to consult with a lawyer, "all interrogation of the suspect must cease 'until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" *United States v. Robinson*, 586 F.3d 540, 545 (7th Cir. 2009) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). Even if the accused initiates conversation after exercising his right to counsel, the prosecution retains the burden "to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044 (1983). A court's preliminary inquiry is to determine whether the accused initiated conversation in a manner evincing a "willingness and a desire for a generalized discussion about the investigation." *Id*. If this threshold is met, a court must then determine

whether the accused waived his right to the presence of counsel and his right to remain silent during interrogation. *Id.* Waiver of counsel must not only be voluntary, but must also constitute a knowing and "intelligent relinquishment or abandonment of a known right or privilege." *Edwards*, 451 U.S. at 482.

Here, the evidence reveals that Velez reinitiated communication with the police by evincing a desire for a generalized discussion about the investigation, and that he subsequently waived his Fifth Amendment right to counsel and his *Miranda* rights. *Velez*, 388 Ill.App.3d at 496-97, 903 N.E.2d at 47. Velez was advised of his *Miranda* rights on at least three separate occasions: before Detective Day interviewed him about the shooting after Velez first arrived at the police station; when an ASA arrived the next day to interview Velez; and when Detective Kolman responded to Velez's knock on the interview room door and Velez asked to speak with the detective. *Id.* Each time, Velez voluntarily waived his rights and spoke to either the detectives or an ASA. *Id.* More specifically, after Velez knocked on the locked interview room door, Detective Kolman even asked Velez whether he had been advised by his counsel not to speak with detectives. *Id.* at 497, 903 N.E.2d at 47. Velez replied affirmatively, but stated that he still wished to speak to Detective Kolman and an ASA despite those instructions. *Id.* At that point, Detective Kolman again read Velez his *Miranda* rights and Velez voluntarily waived them. *Id.* Velez then spoke to ASA Bischoff and then agreed to memorialize his statement in writing. *Id.*

Velez argues that his "knock-on-the-door was not the kind of action/conduct that evinced a willingness and desire for a generalized discussion about the investigation." Reply Br. (Dkt. 15) at 12. While a "knock-on-the-door" standing alone might not show willingness to discuss the pending investigation, Velez went on to request to speak to Detective Kolman and to waive his

*Miranda* rights after Detective Kolman specifically reminded him that his attorney warned him not to speak to the police. These actions demonstrate the requisite willingness to engage in conversation about the investigation. *See Bradshaw*, 462 U.S. at 1045-46. Velez's actions demonstrated a voluntary and "intelligent relinquishment" of his rights. *Edwards*, 451 U.S. at 482.

Velez asserts in his petition that Detective Kolman posed questions that were "formulated and calculated to draw petitioner into a conversation and elicit damaging evidence," Pet. at 6(a), but he fails to identify any such questions. The record reflects only Kolman's testimony that, in response to Velez's knock on the door of the interview room and beckoning to the Detective, he asked what Velez wanted; when Velez told Kolman he wanted to talk, Kolman asked questions that served only to confirm that notwithstanding his retention of counsel and counsel's advice not to talk, Velez wanted to talk anyway. Reminding the defendant that his lawyer told him not to talk is about as far from an interrogation designed to elicit incriminating statements as can be imagined. *See generally Rhode Island v. Innis,* 446 U.S. 291 (1980) ("interrogation" encompasses only "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."); *United States v. Briggs*, 273 F.3d 737, 740 (7th Cir. 2001) (a "police officer's response to a direct inquiry by the defendant does not constitute 'interrogation'").

Therefore, the state court's decision not to bar the statement Velez made after he reinitiated contact with the police was not contrary to federal law, and Velez's third argument fails.

### E.  Velez's Trial Counsel Was Not Ineffective.

Velez next argues that his trial counsel was ineffective because his counsel should have filed a motion to quash Velez's arrest and to suppress all evidence derived from the arrest. Reply Br. (Dkt. 15) at 13. Velez asserts that such a motion would have been granted because he was arrested without probable cause. *Id.* at 14. However, Velez's trial counsel did file a motion asking for that relief, although he ultimately withdrew the motion after Detectives Day and Kolman testified about Velez's interrogation. Transcript (Dkt. 10-11) at 150. The State claims that Velez's counsel withdrew the motion because he concluded that the motion would have been denied because of evidence showing that Velez was not under arrest until after he made inculpatory statements.

Criminal defendants are entitled to "reasonably effective" assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to successfully claim ineffective assistance of counsel, a defendant must show that his legal representation "falls 'below an objective standard of reasonableness,' as indicated by 'prevailing professional norms,' and the defendant suffers prejudice as a result." *Chaidez v. United States*, 133 S. Ct. 1103, 1107 (2013) (quoting *Strickland*, 466 U.S. at 687-88). Judicial scrutiny of an attorney's performance should be highly deferential, and to succeed on a claim of ineffective assistance "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal citation omitted).

Velez's assertion that he was arrested without probable cause is untenable. His inculpatory statements to police were clearly sufficient to establish probable cause and Velez has not presented clear and convincing evidence that he was arrested before he made those statements. Velez argues that he was arrested as of the time when he was brought to the police

station as a "person of interest," but the evidence adduced at trial reveals that he initially went to the police station voluntarily. *Velez*, 388 Ill.App.3d at 505, 903 N.E.2d at 53. When he first came to the police station, Velez was not in handcuffs nor was the door to his interview room locked. *Id.* at 496, 903 N.E.2d at 47. Furthermore, Velez had not been photographed or fingerprinted at that time. *Id.* The appellate court's finding, on the basis of this evidence, that Velez was not in custody when first interviewed by the police is reasonable and entitled to deference.

Velez complains that the Illinois Appellate Court did not permit him to buttress his claim on appeal with a police report indicating that he was "in custody" on January 9, and with an "Investigative Alert" indicating that Velez was wanted for questioning only, and that there was no probable cause for his arrest.[4] The Illinois Appellate Court rejected Velez's efforts to present police reports because they constituted inadmissible hearsay. *Id.* at 502, 903 N.E.2d at 51. That determination was unquestionably correct under both state and federal rules of evidence (Rule 803(8) of both the federal and Illinois rules of evidence exclude police reports from public records hearsay exception). The exclusion of hearsay evidence does not ordinarily implicate constitutional concerns; criminal defendants "must comply with established rules of procedure and evidence designed to assure both fairness and reliability." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). That said, "the exclusion of defense evidence abridges an accused's right to present a defense where the restriction is arbitrary or disproportionate to the purposes it is designed to serve and the evidence implicates a sufficiently weighty interest of the accused."

---

[4] A copy of the Investigative Alert was included in the appendix to Velez's opening brief in support of his direct appeal (Dkt. 10-2). The Court has been unable to locate in the record a copy of the police report referenced in the petition, however. His brief on direct appeal states that "the police report for January 9, 2004" states, in part: "On today's date Intelligence Unit Officers took into custody VELEZ, Victor, AKA Little Vic based on information received from Investigative Alert #299918521." *Id.* at 36.

*Harris v. Thompson*, 698 F.3d 609, (7th Cir. 2012) (quoting *United States v. Scheffer*, 523 U.S. 303, 308-09 (1998) and *Rock v. Arkansas*, 483 U.S. 44, 56 (1987) (internal quotes omitted)). Velez does not argue that exclusion of the police report reflecting that he was "in custody" itself violated his right to present a defense, and that argument would be untenable because the information went not to his guilt or innocence but was probative, if at all, of only the collateral issue of whether he had been arrested without probable cause and therefore whether admission of his written statement should be excluded based on a violation of the Fourth Amendment. Further, whether an individual is in custody is a mixed question of fact and law. *United States v. James*, 113 F.3d 721, 727 (7th Cir. 1997). The information that Velez sought to admit from the report related not to questions of fact on which the legal determination depended, but to the legal question of whether he was "in custody" at the time he was first interviewed. The answer to that question turns entirely on evaluation of facts that Velez has not disputed: he was not handcuffed; he was waiting in an unlocked interview room; and he had not been fingerprinted, photographed or otherwise processed for arrest. The Court therefore perceives no constitutional violation in the state court's exclusion of the report in question as hearsay.

In any event, even if the police report should have been admitted, the state courts were entitled to credit the sworn testimony presented by the police officers about whether Velez was in custody when they interviewed him over that report. Hearsay evidence outside the trial record does not suffice to rebut the presumption of correctness of the state court's findings. *See, e.g., Perry v. Kemna*, 356 F.3d 880, 888-89 (8th Cir. 2004) (rejecting petitioner's presentation of hearsay material outside of trial record to rebut state court findings). Merely "identifying conflicting evidence is not enough" to rebut the presumption of correctness of state court findings. *Thompkins*, 698 F.3d at 985 (petitioner's identification of record testimony that

conflicted with state court finding rejected as insufficient to overcome presumption of correctness where other record testimony supported that finding). *See also, e.g., Morgan,* 662 F.3d at 799 (state court's decision to credit one view of evidence over another is entitled to deference, even where that view requires "a stretch of the imagination").

As for the Investigative Alert, it contributes nothing to Velez's cause. That document isn't hearsay (the appellate court excluded it because it had not been presented at trial and was being presented only as an attachment to Velez's appellate brief), but it is not probative of the question of whether Velez was in custody during his initial interview with police. Indeed, if relevant at all, the Investigative Alert would seem to support the appellate court's finding that Velez was not in custody when brought to the police station for questioning since it advised police that there was *not* probable cause to arrest Velez. In this regard, the Court takes judicial notice that the Chicago Police Department directive governing Investigative Alerts states that "an arrest is not authorized" by the issuance of an "Investigative Alert/No Probable Cause to Arrest" alert (the version issued with respect to Velez) and requires officers to (among other things) "inform the individual that [the officer] seeks to interview the individual about a specific police matter and request that the subject voluntarily accompany the officer(s) to the district station." And "if the individual will not voluntarily accompany the officer(s) to the district station," the Directive instructs officers to complete a report and not to detain the individual. *See* CPD Special Order S04-16 (Issued March 5, 2001) (available at http://directives.chicagopolice.org/directives/Investigative Alerts) (last visited Aug. 29, 2013). Officers *might* have violated this directive, of course, but admitting the Alert itself and thereby confirming that officers were under orders not to arrest Velez would have done nothing to establish his claim that they did so.

During his interview with the police, Velez gave inculpatory statements and implicated himself in the murder. *Id*. Those statements gave police probable cause to arrest Velez, and he was later arrested on the basis of those statements. *See Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007) (probable cause exists when the facts and circumstances would prompt a reasonable person to believe that an offense has been committed and that the accused committed the offense). After the officers who interviewed Velez testified at the hearing on Velez's motion to suppress his statements, Velez's trial counsel apparently recognized that Velez's arrest was valid, so he withdrew the motion to suppress that he had filed. Because the record establishes that a motion to quash arrest and suppress evidence could not have succeeded under these facts, withdrawal of the motion to quash was not objectively unreasonable, and Velez suffered no prejudice from his counsel's decision not to press the motion. Therefore, he has not met his burden of proving that his conviction was prejudiced by his trial counsel's conduct under *Strickland*, and the state court's ruling on this point was not in error.[5]

### F. Velez's Appellate Counsel Was Not Ineffective.

Velez also argues that his appellate counsel, on direct appeal, was ineffective because he did not argue that his trial counsel was ineffective for failing to challenge the admissibility of the

---

[5] The Court notes as well that Velez's assumption that his statements would have been suppressed had the state court found him to be in custody when the police first interviewed him is speculative. A confession obtained through custodial interrogation after an illegal arrest is not inadmissible *per se;* it is not subject to exclusion if "the confession is attenuated enough from the illegal arrest that the confession is 'sufficiently an act of free will to purge the primary taint.'" *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003) (quoting *Brown v. Illinois*, 422 U.S. 590, 602 (1975)). This determination requires analysis of the voluntariness, temporal proximity, the presence of intervening circumstances, and the flagrancy of the police misconduct. *Id.* In light of Velez's failure to rebut the state court's finding that he was not in custody during the initial interview, however, it is not necessary to undertake the attenuation analysis (which has never been addressed by Velez, the state, or the opinions issued in any of the state court proceedings, and has not been discussed by the parties in connection with the instant petition).

written statement. Applying the *Strickland* test for ineffective assistance of counsel as set forth above, Velez has not shown that his counsel was ineffective or that he suffered prejudice. As discussed previously, Velez cannot show that the written statement was inadmissible on the grounds that it was written by ASA Bischoff and did not contain a verbatim transcript of his words. Therefore, Velez cannot establish that his trial counsel was ineffective. Hence, he also cannot establish that his appellate counsel was ineffective for failing to raise his trial counsel's ineffectiveness. Velez has not met the AEDPA standard to entitle him to relief on this claim.

**G.  Velez's Sentence Does Not Violate Clearly Established Federal Law.**

Finally, Velez argues that his sentence of forty-five years' imprisonment is excessive because he was only an accomplice to the shooting and the actual shooter received a shorter sentence. Petition (Dkt. 1) at 6(f). He asserts that his sentence is an inconsistent application of the law because other similarly situated criminal defendants convicted as accomplices generally receive shorter prison sentences than the principal offenders. Reply Br. (Dkt. 15) at 15.

Under the United States Constitution, after a defendant's guilt has been proven beyond a reasonable doubt, "the court may impose . . . whatever punishment is authorized by statute for his offense, so long as that penalty is not cruel and unusual . . . and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth Amendment." *Chapman v. United States*, 500 U.S. 453, 465 (1991). Velez's 45-year sentence for first degree murder is authorized by statute, and he has made no showing that the sentence is cruel or unusual or that it was imposed on him based on an arbitrary or prohibited factor. Velez fails to identify any precedent whatsoever indicating that it is a violation of due process or equal protection to impose a greater sentence on a defendant convicted under an accountability theory than that imposed on a principal offender in another case. *Cf. Dellinger v. Bowen*, 301 F.3d 758,

768 (7th Cir. 2002) (rejecting, on habeas review, petitioner's argument that "it is a violation of the Equal Protection Clause to receive a greater sentence than one's partner in crime"). There could be many reasons that Velez received a longer sentence than did Vega, and Velez fails even to say what sentence Vega received, much less what factors that sentence was based upon or why the disparity based on those factors was constitutionally impermissible. Velez's sentence was authorized by Illinois law and is not contrary to Supreme Court precedent, so Velez's final argument fails and his habeas petition is denied.

### H. Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant Velez a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

A certificate of appealability may not issue unless the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This standard requires a finding that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

In this case, the Court believes that reasonable jurists would not debate the Court's conclusion that Velez's habeas petition fails. Therefore, the Court declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

\*     \*     \*

For the reasons set forth above, the Court denies Velez's petition for a writ of habeas corpus and declines to certify any issues for appeal.


Entered: August 30, 2013

John J. Tharp, Jr.
United States District Judge